The Executors of James C. Lord, deceased, et al.

v.

The Carbon Iron Manufacturing Company.

1. Land on a lower level is under a natural servitude to that located above it, to receive the water flowing down to it naturally.

2. It is the natural right of each of the owners of two adjacent mines, neither being subject to any servitude to the other, to work his own mine in the manner most convenient and beneficial to himself, though the natural consequence may be that some injury will accrue to his neighbor.

3. For damages resulting from natural causes, or from lawful acts, done in a proper manner, the law gives no redress, but when one of two adjoining mine-owners conducts water into his neighbor's mine, which would not otherwise go there, or causes water to go there at different times, and in larger quantities, than it would naturally go there, he is answerable for the damages.

4. Equity will restrain one of two adjacent mine-owners from removing the supports which prevent the surface of his mine from caving in, when it appears that such removal will result in the destruction of his neighbor's mine.

5. Mandatory injunctions are rarely granted before final hearing, and are, as a general rule, strictly confined to cases where the remedy at law is plainly inadequate.

---

On application for injunction, heard on bill and affidavits, and answer and affidavits, and order to show cause.

*Mr. S. H. Little* and *Mr. Theodore Little*, for complainants.

*Mr. H. C. Pitney*, for defendants.

Lord's Executors v. Carbon Iron Manufacturing Co.

VAN FLEET, V. C.

The parties to this suit own adjoining iron mines in the county of Morris, and work the same vein of ore, but at different levels. The complainants' mine is in the lower one. The defendants stopped work in their mine in the fall of 1882, having prior to that time removed all the ore which could be removed with safety to their mine. Most of the ore iron remaining in their mine is in the pillars and walls, which were left, while mining operations were being carried on, as supports to prevent the surface from caving in. The defendants' mine adjoins the Rockaway river, its western wall being about seventy-five feet, vertical measurement, below the bed of that stream. The surface above both mines is low and wet, and both carry a great deal of water, and are, what miners call, wet mines. The complainants are actively engaged in working their mine. They say they have ninety thousand tons of ore in sight, and it is estimated that four hundred and ninety thousand tons may be taken out of their present shaft. Their mine, they say, is worth $150,000. The special reason why the complainants seek the aid of the court at this time is, that the defendants have recently avowed a purpose to reduce the pillars of their mine, and take out all the ore which can be taken out at a profit, and let their mine fill with water. They admit, by their answer, that such is their purpose, and they claim the right to reduce the walls and pillars of their mine regardless of the effect that their reduction may have on the mine of the complainants. They admit that they stopped work in their mine in the fall of 1882, having prior to that time taken out most of the ore that was worth taking out, except what was in the pillars, and they say that it is usual, when a mine is finally abandoned, to take out the pillars which have been left to support the surface, commencing at the bottom and working upwards, and when the pillars are reduced, to let the mine cave in if it will.

Two communications now exist between the two mines. They are both the result of trespasses committed on the lands of the complainants. The Carbon Iron Company were the predecessors in title of the defendants. While they owned the mine now

owned by the defendants, and, as the answer says, somewhere about the year 1872, they, by accident, worked over the line, about twenty-one feet, on the lands of the complainants. At the time this trespass was committed the complainants had not sunk their shaft, nor mined any ore near the defendants' mine. The other trespass was committed by the defendants' lessees sometime between February, 1881, and the fall of 1882. It was committed at a point lower down on the vein, and extended over the line, as the defendants say, only about four feet, horizontal measurement, but along the vein a much greater distance. The complainants began to sink their shaft in 1879, and in carrying it down, broke into both the openings made into their lands by the trespasses just mentioned. The apertures are the result of the joint acts of the parties; in the one case of the acts of the Carbon Iron Company and the complainants, and in the other of the acts of the defendants' lessees and the complainants. It is proper to state here that it is not disputed that the complainants sunk their shaft at the only point at which it could be sunk to reach the ore lying adjacent to the defendants' mine. The complainants' mining engineer swears that this is the fact, and, in demonstration of the truth of his statement, he says that all previous attempts to sink a shaft at other points on the complainants' land, to reach this ore, failed in consequence of the difficult character of the ground encountered. The defendants do not deny the truth of this statement.

The complainants, on these facts, ask two kinds of prohibitory relief: First, that the defendants may be enjoined from removing the pillars and walls and other supports of their mine to such an extent as to endanger the caving in of the surface; and secondly, that they may be enjoined from permitting the water to flow from their mine into the complainants' mine through the two apertures. The defendants deny the complainants' right to either measure of relief. They claim the right to remove all the ore from their land without regard to the effect the removal may have on the complainants' mine. They say that their right to do so is in no way restricted or impaired by the fact that their predecessors in title, and their lessees, have unlawfully made

openings into the complainants' land, in consequence of which, if the surface of their mine caves in, the mine of the complainants will be submerged and destroyed. They do not attempt to justify the trespasses. They say that they were committed unintentionally, and that while this does not relieve the persons who committed them from the legal consequences of their wrongful acts, still the complainants' only remedy is an action of trespass against the persons who invaded their possession, in which they must recover their damages once for all. They also say that, however ruinous or destructive their threatened action may be in its consequences to the complainants' mine, yet as they did not make the apertures, nor commit the trespasses which caused them, they cannot be held liable, either at law or in equity, for any injury the complainants may suffer from them.

For water which gets into the complainants' mine, from the defendants', by gravitation or percolation, or by any other natural means, it is clear that the defendants are in no way responsible. Land on a lower level is under a natural servitude to that located above it, to receive the water flowing down to it naturally. Nor can the defendants be held liable for any injurious consequences resulting to the complainants from work done by the defendants in their mine in a skillful and proper manner. It was declared in *Smith* v. *Kenrick, 7 C. B. 515,* to be the natural right of each of the owners of two adjacent mines, neither being subject to any servitude to the other, to work his own in the manner most convenient and beneficial to himself, although the natural consequence may be that some prejudice will accrue to the owner of the adjoining mine, so long as that does not arise from negligent or malicious conduct. The rule defining the rights and liabilities of adjoining mine-owners, may be stated in this form : For damages resulting from natural causes, or from lawful acts done in a proper manner, the law gives no redress, such losses being regarded as *damnum absque injuria,* but where one of the two adjoining mine-owners conducts water into his neighbor's mine, which would not otherwise go there, or causes it to go there at different times and in larger quantities than it would go there naturally, he commits a wrong which the law

will redress. This rule, stated in a more amplified form, was applied in *Baird* v. *Williamson, 15 C. B. (N. S.) 376.* Erle, C. J., in delivering the opinion of the court in that case, said : " The defendants, as occupiers of the higher mine, have no right to be active agents in sending water into the lower mine. The plaintiffs, as occupiers of the lower mine, are subject to no servitude of receiving water, conducted by man, from the higher mine. Each mine-owner has all rights of property in his mine, and, among them, the right to get all minerals therefrom, provided he works with skill and in the usual manner. And if, while the occupier of a higher mine exercises that right, nature causes water to flow to a lower mine, he is not responsible for this operation of nature. If the owner of the lower mine intends to guard against this operation, he must leave a barrier at the upper part of his mine to bay back the water of his higher neighbor. The law imposing these regulations for the enjoyment of somewhat conflicting interests, does not authorize the occupier of the higher mine to interfere with the gravitation of the water, so as to make it more injurious to the lower mine, or advantageous to himself." The justice and good sense of this rule are patent. It has controlled most of the adjudications on this subject. Among the cases which have been decided by this principle are the following : *Crompton* v. *Lea, L. R. (19 Eq. Cas.) 115 ; Smith* v. *Fletcher, L. R. (7 Exch.) 305,* and *Locust Mountain Coal and Iron Co.* v. *Gorrell, 9 Phila. 247.*

The only case containing any remarks tending to support the extreme ground taken by the defendants, is *Clegg* v. *Dearden, 12 Ad. & E. (N. S.) 576.* The defendant in that case had made an opening into the mine occupied by the plaintiff. An action was then brought, which was subsequently referred to an arbitrator. The arbitrator made an award to the plaintiff for the damages he had sustained by the opening. The defendant paid the damages so awarded and the plaintiff accepted them. Afterwards, the plaintiff brought a new action to recover damages which he claimed to have suffered subsequent to the date of the award. He alleged that the defendant had wrongfully kept the aperture open subsequent to the award, in consequence of which the water

from the defendant's mine had constantly flowed into his, to his great damage, and that the defendant should therefore be required to make his loss good. The court held that the flowing of the water and the damage thereby caused to the plaintiff, was merely consequential to the making of the aperture, and as the plaintiff had already received compensation for that, he had no ground of action. The court, it is true, said also that the defendant, for making an excavation and aperture in the plaintiff's land, was liable to an action of trespass, but that no cause of action arose from his omitting to re-enter the plaintiff's land and fill up the excavation. Such an omission, it was held, was neither a continuation of the trespass, nor of a nuisance, nor a breach of a legal duty. But this, it must be remembered, was said in a case where the court found that the plaintiff's damages, both immediate and consequential, had been judicially ascertained and paid by the wrong-doer and accepted by the person injured. That case did not stand as this does, where the injured person is before the court, with his wrongs wholly unredressed, asking for such remedy as will give him adequate protection against the consequences of an unlawful invasion of his rights. All the complainants ask is protection against the injurious consequences which will inevitably result from what the defendants avow they mean to do.

The duty of the court is plain. The law is settled. In a case substantially identical in all its material facts, the chancellor extended protection to the aggrieved party by injunction. *Thomas Iron Co.* v. *Allentown Mining Co., 1 Stew. Eq. 77.* In that case, as here, an opening had been made from the defendants' mine into the complainants', unlawfully, and there, as here, the defendants threatened to remove the pillars and other supports and let their mine fill with water. The chancellor held that inasmuch as the defendants had made an opening into the complainants' mine, it was no stretch of authority to prohibit them from such use of their property as would inflict damage on the complainants' property. He also declared that even if the complainants had themselves made the opening between the two mines, it would still have been the duty of the court to have pro-

tected the complainants against the ruinous consequences neces-
sarily resulting from the removal of the supports of the defend-
ants' mine, and that the maxim *sic utere tuo ut alienum non lædas*
would, under such a state of facts, have furnished sufficient
ground for such relief.   It appeared in that case, as it does in
this, that if the defendants' mine should be flooded, the com-
plainants' mine would be utterly destroyed.   The chancellor
said, in view of this fact, that the court should not hesitate to
restrain a trespasser from an act which would inflict such an
injury on the property on which he had trespassed.   What the
defendants propose to do is not to work their mine—that they
may unquestionably do without regard to the consequences to the
adjoining mine, so long as they do their work in a skillful,
reasonable and proper manner—but what they propose to do is
to destroy their mine, and it is certain if they are permitted to
destroy their mine they will also destroy that of the complain-
ants.   This fact, in my judgment, makes the duty of the court
perfectly plain.

The complainants are entitled to an injunction restraining the
defendants from removing the pillars, walls and other supports
of their mine to such an extent as to endanger the caving in of
the surface.

The complainants' right to the other measure of relief they
ask is not so clear, on the facts now before the court, as to make
the path of duty plain.   They ask an injunction restraining the
defendants from permitting water to flow from their mine into
the complainants' mine through the two apertures.   Though they
pray that relief be granted to them by a simple prohibition, yet it
is obvious that if the relief they ask be given to them, it must
be mandatory in its character.   The defendants cannot prevent
the water from flowing through the two apertures except by
building bulkheads or some other barrier, or by pumping.   The
injunction, to accomplish its purpose, must command or coerce
the defendants to do certain affirmative acts, not merely to re-
main inactive or refrain.   Injunctions of this nature are rarely
granted before final hearing, or before the parties have had a full
opportunity to present all the facts of the case in such manner

as will enable the court to see and judge what the truth is. They are always granted cautiously, and are strictly confined to cases where the remedy at law is plainly inadequate. In the present condition of the case, it is impossible to say that the complainants' injuries, resulting from the flow of the water through these apertures, will be of such a character as to entitle them to relief in this form. The affidavit made by the complainants' mining engineer states that these apertures afford a free entry into the complainants' mine for the water of the defendants' mine, and that if the pumps in the defendants' mine were to be stopped, the water would probably drown the complainants' mine; but this, it will be observed, is a mere opinion. No facts are given; we are not even told the carrying capacity of the apertures, nor how much water is now passing through them daily from the one mine into the other. Besides, the superintendent of the complainants' mine says, in his affidavit, that owing to the seamy character of the wall between the two mines no bulkhead that could be built at the apertures would give effectual protection to the complainants, for the percolation through the walls would throw into the complainants' mine such a large quantity of water as to do them very serious damage. But the defendants are not answerable for any injury the complainants may suffer from percolation. That is the work of nature, and any loss they sustain from that cause they must bear as one of the disadvantages naturally incident to the location of their mine. Now, in this condition of the proofs, it is, I think, obviously impossible to form anything like a just judgment as to how much of the water, in case the complainants' mine should be submerged, would flow through the walls, and how much would flow through the apertures. It should also be stated, in this connection, that the superintendent of the defendants' mine swears that half the water in the defendants' mine is thrown there by the complainants. The complainants certainly are not entitled to protection against water which, rising in their mine, is thrown by them into the defendants' mine and then flows back. As the case now stands, I am not convinced that the injury of which the complainants complain is of a character to

entitle them to a preliminary injunction, or that the defendants are responsible for it.   The second branch of the relief asked by the complainants must therefore be denied.